Simpson, Collins & Moore and Leo Brewster, all of Fort Worth, for appellants.

L. C. Penry, of Floydada, and J. H. Synnott, of Dallas, for appellees.

## WILLIAMS et al. v. DANIEL et al.

### No. 12243.

Court of Civil Appeals of Texas. Fort Worth. June 21, 1930.

Rehearing Denied July 19, 1930.

CONNER, C. J.

This suit was instituted by Mrs. Ida Williams, joined pro forma by her husband, John T. Williams, against the appellee National Loan & Investment Company to set aside a conveyance by the plaintiffs to M. A. Daniel and to cancel a promissory note of said M. A. Daniel, payable to Williams and wife, purporting to be for part of the purchase money for the property conveyed, which had been purchased by the appellee loan company.

The suit was based upon allegations that the property described in the conveyance to M. A. Daniel was at the time the homestead of the plaintiffs and that the conveyance was a simulated one, made for the purpose of obtaining a loan, of all which the loan company had notice or knowledge of such facts as put it upon notice. The appellee loan company filed a general and special denial, specially denying notice, actual or implied, of the simulated sale to the Daniels, if it was such. The loan company also pleaded by way of cross-action that in its purchase of the note it had taken up and paid off certain tax and other liens on the property to which it desired to be subrogated in event the sale proceedings were set aside.

This is the second appeal in the case. The result of the former appeal is reported in 4 S.W.(2d) 189, where may be found a full history of the proceedings and evidence re-

lating thereto as it now appears before us, except such as we shall hereinafter detail, and which need not now be here repeated.

Among other things, the plaintiffs alleged that J. L. Penry, Sr., and J. L. Penry, Jr., were agents or representatives of the loan company and that they knew or had knowledge of such facts as put them upon notice that the sale of their homestead to Daniel was a simulated one.

The case was submitted to a jury on special issues. As submitted, the charge in effect assumed, as the evidence authorized, that the sale of the property in question was at the time of its conveyance to M. A. Daniel the homestead of the plaintiff Mrs. Ida Williams and her husband, John T. Williams. The issues submitted were therefore limited to the question of whether J. L. Penry, Sr., or J. L. Penry, Jr., had notice of the simulated character of the conveyance. In answer to question 1 the jury found that J. L. Penry, Sr., did not know that the transfer of the property was simulated for the purpose of obtaining a loan. In answer to issue 2 the jury found that J. L. Penry, Jr., did know prior to the closing of the loan in controversy and advancing the money to Williams that the deed from Williams and wife to M. A. Daniel was a simulated sale; that is, that it was merely a transfer of such property for the purpose of obtaining a loan and was not intended as a sale to Daniel. In answer to question 3 the jury found that J. L. Penry, Sr., was without notice of facts relating to the simulated sale which if pursued with reasonable diligence would have disclosed the real facts concerning the sale. In answer to question 4 the jury found that J. L. Penry, Jr., did have notice of facts relating to the simulated sale which would have put an ordinarily prudent person upon inquiry, which inquiry, if pursued with reasonable diligence, would have disclosed the real facts concerning the sale.

It was further found in answer to special issues that defendant the National Loan & Investment Company did not have any knowledge prior to or at the time the loan in question was made through any agent or officer that the property belonged to or was the homestead of the plaintiffs, and that neither J. L. Penry, Sr., or J. L. Penry, Jr., had "any authority to make loan contracts" for the defendant loan company.

In answer to special issues requested by the plaintiff and submitted, the jury found that both J. L. Penry, Sr., and J. L. Penry, Jr., had "apparent authority to make loan contracts for the National Loan & Investment Company, or to advise loan applicants upon matters of procedure and form notes and purchasing sale thereof."

■ While the defendant loan company in its answer specifically denied that either J. L. Penry, Sr., or J. L. Penry, Jr., had authority to make loan contracts, it is to be noted from the issues submitted that the court assumed that they were agents for some purposes, doubtless because of the un contradictory character of the evidence, and the appellee loan company neither requested the submission of the issues as to the fact of agency, nor complained of the court's charge because of having omitted them. Nor is the court's charge objected to because of a failure to submit the issue of whether or not the property involved was the homestead ◄ of Mrs. Ida Williams and husband, John Williams, and, if so, whether or not the sale by them to Daniel was a simulated one. Nor has the appellee loan company complained of the answers of the jury to issues 2 and 4 as unsupported by the evidence either in the trial court or here. These issues therefore, in so far as presented and controverted in the pleadings, must be held to have been waived by the appellee loan company in accord with the ruling in Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084.

■ In addition to this, J. L. Penry, Jr., testified, in substance, among other things, that:

"I had some connection with his (J. T. Williams) procuring from the National Loan & Investment Company a loan of $3500 about that time (about October 1, 1924). I was not a representative of the National Loan & Investment Company at that time as an agent, but as a local representative or local correspondent, as I was called. Among the duties I had as such local correspondent, I made out applications where people would come up for loans and I inspected the property to see whether or not the security was all right and then I prepared the application and submitted that for the loan. I inspected the property as to its probable value. I did not pass on the loan; I submitted the application to the office for the company's approval, together with my idea of its value. I took the application in this case. Mr. Williams gave me the data by which I answered the several questions that were later signed and sworn to by Mr. Daniel. As to the history of this loan, I will say that Mr. Williams came to the office and said that he was selling a piece of property and that he was selling it to Mr. Daniel, who, at that time, so he represented, was the manager or the relief manager of the Walk-Over Shoe Company and that his wife had looked at the property and selected it as their home—that is Mr. Daniel's wife and that Mr. Daniel was buying it—was going to buy it as his home.

"After I had inspected the property, Mr. Williams brought the deed where they had conveyed the property to Mr. Daniel; he told me at the time that Mr. Daniel could not be present and that he would have to

answer the questions as to describing the property and that he would have Mr. Daniel look it over and sign it if it was correct. The instrument now shown me is the application that I took at that time. The answers to these questions were furnished by Mr. Williams. I believe he said that Mr. Daniel was in Little Rock, but that he was coming here to take charge of the Walk-Over Shoe store. I never actually met Mr. Daniel.

"In addition to this application for a loan that I sent to the home office, I also answered certain questions on an additional report that the company required; Mr. Williams had given me all the information for that. * * *

"I asked Mr. Williams how old Mr. Daniel was and I then wrote down what he told me. I wanted to be sure that he was of age. * * * When I made out this additional report it was not the first time that Mr. Williams had been up to see me about borrowing money; we had looked at other property that he had in Polytechnic—I had been out to see other property that he claimed to own in Polytechnic. I don't know how many such trips I made to Polytechnic. My recollection is that he claimed to own four or five houses in one block in Polytechnic and he wanted to get loans on them, representing that he was selling them to people who were buying them as homes. We did not make him any loans as a result of those investigations; I did not recommend any loans on the houses that I looked at in Polytechnic.

"It was shortly after I had looked at the Polytechnic property that he came up to see about a loan on this Jefferson street property. I don't remember any discussion I had with him about being overloaded with houses that he owed too much money on. As to the house on Jefferson Street, he told me that he was selling it to this man Daniel; he did not tell me that Daniel was his nephew. * * * I looked at the property on Jefferson Street, but did not go inside the property. I could not tell whether the house was vacant or occupied when I inspected it; the shades were drawn. The house was closed up as far as I could tell without going inside. * * *

"I did not have any suspicion, much less knowledge, that the sale to Daniels was anything other than a bona fide sale; he never said anything to me indicating that it was other than a bona fide sale."

On cross-examination he said, among other things, that:

"I have been with the National Loan & Investment Company since 1916—twelve years. I am about 36 years old and was 24 years old when I started with the company. I did not start with the company in Fort Worth, but in Dallas; I did not work directly for the company at that time, but was in my father's office. I was there in my father's office from 1914 to 1916, and in 1916 I went to Houston, where I was connected with the National Loan & Investment Company for about a year and then I came to Fort Worth. My father's office in Dallas at that time was a branch office of the National Loan & Investment Company. I was in my own office in Houston, and it was one of the offices of the National Loan & Investment Company in Houston. I was there nearly a year, and then I came to Fort Worth; that would have made it 1917 when I came to Fort Worth; since coming to Fort Worth I have officed in the Fort Worth National Bank Building—that is, from 1917 to 1919, I was in the army and then after I got out of the army, I came back to the Fort Worth National Bank Building, and was there until some time in 1925.

"This transaction with Williams began in September, 1924. I was connected with the National Loan & Investment Company from the time I got out of the army in 1919 until 1925 and was in their office in Fort Worth; I had my own office here, but I was the correspondent for the National Loan & Investment Company. The date of this Williams application for a loan is September 10, 1924. That was the time that Mr. Williams was dickering with me for this loan. * * *

"It was my business to pass on loans that I solicited as to what I thought would be proper security and then the application was submitted for final approval. When a man came in and wanted a loan I would take his application and go out and inspect the property and pass on the security. I don't know how much property I have passed on a year; I don't know how much, in dollars and cents, I passed on for loans in a year."

We accordingly conclude that J. L. Penry, Jr., at least was such an agent or representative of appellee loan company as to require us to hold that the company is affected with the knowledge of J. L. Penry, Jr.

In Chronister Lumber Co. v. Williams, 116 Tex. 207, 288 S. W. 402, by Section A of the Commission of Appeals, approved by the Supreme Court, it was said that a corporation can act only through the agency of men and women, and that no official relation need exist between master and servant in order to constitute the act of the servant the act of the corporation.

In Quinn v. Glenn Lumber Co., 103 Tex. 253, 126 S. W. 2, by our Supreme Court, it was held that where it was shown to be the duty of the foreman in a sawmill to keep the machinery in proper condition, he represented the master in the performance of a nondelegable duty.

In Law v. Texas State Mut. Fire Ins. Co., 12 S.W.(2d) 539, by Section A of the Commission of Appeals, it was held that the

knowledge of a soliciting agent of an insurance company that an applicant for insurance on certain premises had a tenant occupying them, and for which reason the agent refused to take the application, was the knowledge of the insurance company.

In Southern Mutual Fire Ins. Co. v. Mazoch Bros., 291 S. W. 257, by the Austin Court of Civil Appeals, it was held that an agent with authority to solicit fire insurance, transmit applications therefor, make inspection, and report on matters affecting risk, has authority to bind the company by notice as to all matters of fact coming to his knowledge at the time he takes the application which bear upon the risk involved, the subject-matter of insurance, or other questions affecting the validity of the policy issued thereon.

In Standard Savings & Loan Ass'n v. Fitts, 24 S.W.(2d) 507, by the Texarkana Court of Civil Appeals, it was held that notice to an agent in the course of his employment and in relation to the matter within the scope of his actual or apparent authority is notice to his principal, whether agent communicates his knowledge to the principal or not.

See, also, People's Ice Co. v. Nowling (Tex. Civ. App.) 16 S.W.(2d) 976; Cicero-Smith Lbr. Co. v. Denton (Tex. Civ. App.) 16 S.W. (2d) 932; Fort Worth Elevator Company v. Mary Lee Russell, 28 S.W.(2d) 320, by this court; National Guaranty Fire Ins. Co. v. King (Tex. Civ. App.) 24 S.W.(2d) 501.

However, it is held in all of the cases where the subject is discussed that the rule that binds the principal by notice of the facts known to the agent does not apply if the agent and a third person have colluded to defraud the principal. See Standard Savings & Loan Co. v. Fitts (Tex. Civ. App.) 24 S.W. (2d) 507; Cooper v. Ford, 29 Tex. Civ. App. 253, 69 S. W. 487; Centennial Mut. Life Ass'n v. Parham, 80 Tex. 518, 16 S. W. 316. In the last-cited case it is said, quoting from the headnotes:

"Where the agent of an insurance company enters into a conspiracy with an applicant for a life policy to insert false statements in the application, and thereby induce the company to issue the policy, he ceases to be the agent of the latter, and becomes the agent of the applicant, and the company cannot be charged with notice of the facts known to such agent."

Appellees alleged that J. L. Penry, Jr., was not their agent, but, if so, that his knowledge could not be imputed to them, for the reason that he had entered into a conspiracy with John T. Williams to procure the loan, and to that end was acting for Williams and wife. These allegations are purely defensive in character. J. L. Penry, Jr., himself testified, to the effect that he was without knowledge of the simulated character of the Wil-

liams' deed to Daniel. The question therefore of whether there was such a conspiracy and fraudulent acting on the part of J. L. Penry, Jr., as will relieve the appellee company of the burden of his knowledge is a question of fact for the jury's determination. See Campbell v. Crowley (Tex. Civ. App.) 56 S. W. 373; Pickett v. Dallas Trust & Savings Co., opinion by Justice Short of Section B of the Commission of Appeals, approved by the Supreme Court, decided February 12, 1930, 24 S.W.(2d) 354. For definitions of fraud, see 2 Words and Phrases, Second Series, p. 638 et seq., where it is said that a necessary element in fraud and collusion is an unlawful or evil intent. The issue in this case of whether or not J. L. Penry, Jr., acted fraudulently or collusively with J. T. Williams and wife in order to give effect to the simulated sale was not submitted to the jury, and appellees did not object to the charge of the court for an omission to submit such issue, nor did they request its submission. It must therefore be held under the rules in the cases of Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084, 1085, and Bulin v. Smith (Tex. Com. App.) 1 S.W.(2d) 591, that appellee is not now and here in a position to be relieved on the ground that J. L. Penry, Jr., acted fraudulently and collusively in the transaction under consideration. In the opinion of the case last cited, which was by Mr. Justice Speer of Section B of the Commission of Appeals, the following is quoted with approval from the case of Ormsby v. Ratcliffe, to wit:

"* * * When the omitted issue constitutes a complete ground of recovery, or a complete defense, a failure to request a submission of that issue waives said ground of recovery or said ground of defense," citing numerous cases.

We accordingly conclude that the court erred in its judgment in favor of appellee below, and that that judgment should be reversed and here rendered in favor of appellants, canceling the vendor's lien note and trust deed as clouds upon the title of the homestead property described in their petition. It appearing, however, that M. A. Daniel had been duly cited in this case and made no answer, and it appearing without dispute that he executed the $3,500 loan note to the appellee company without actual notice of its defective character, he should be adjudged to pay appellee said note with interest and attorney's fees in accordance with its terms. And it further appearing without dispute that upon the execution of the loan note by Daniel that the appellee loan company forwarded to its representative John Tarleton an approved draft from the proceeds of which he paid in discharge of mechanic's, pavement, and tax liens upon the homestead sums aggregating $1,817.74.

We are accordingly of the opinion that appellee is entitled by way of subrogation to be reimbursed to the extent of such payments in discharge of said liens with legal interest thereon from the date they were discharged, to wit, October 2, 1924, with a lien on the homestead property to secure said payments. See Sanger Bros. v. Ely & Walker Co. (Tex. Civ. App.) 207 S. W. 348.

For the reasons noted, the judgment below will be reversed and reformed as above indicated.