JOHN H. HEGER AND ESTATE OF JANET M. HEGER, DECEASED, JOHN H. HEGER, EXECUTOR, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Heger v. Commissioner
Docket Nos. 20793-91, 22671-91, 22672-91
United States Tax Court
T.C. Memo 1993-408; 1993 Tax Ct. Memo LEXIS 421; 66 T.C.M. (CCH) 610; September 7, 1993, Filed *421 Decisions will be entered under Rule 155. 1. Ps pledged their farm property as collateral for a loan from Bank to W. W defaulted on the loan and Bank instituted proceedings to foreclose on Ps' property. Ps paid Bank to release the lien on their property and protect it from foreclosure. Ps increased their bases in the property to reflect the payment. 2. In 1985, Ts and Ds formed C, a corporation; Ts and Ds contributed $ 1,000 to C in exchange for C stock that qualified as sec. 1244 stock. Shortly thereafter, C borrowed $ 130,000 from Bank 2; Ts and Ds guaranteed C's obligation. In 1987, C ceased its operations. In connection therewith, Ts contributed $ 130,000 to C in exchange for newly issued C stock and C paid the $ 130,000 loan from Bank 2. C dissolved approximately 6 days later. 1. Held: Ps may not increase their bases in the farm property to reflect the payment to Bank. 2. Held further: The $ 130,000 of stock issued to Ts in 1987 does not qualify for ordinary loss treatment under sec. 1244(a), I.R.C.
For petitioner: Rudy M. Groom. For respondent: Derek B. Matta. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: This case is before the *422 Court pursuant to petitions for redetermination of Federal income tax liability filed on behalf of: (1) John H. and Janet M. Heger, (2) George E. and Gail Y. Heger, and (3) James C. and Molly A. Heger. Following a motion by respondent under Rule 141(a), [2] the three cases resulting from these petitions were consolidated into a single case for trial, briefing, and opinion. Following the death of Janet M. Heger, she was replaced in this proceeding by Estate of Janet M. Heger, Deceased, John H. Heger, Executor (Estate of Janet Heger). Unless otherwise noted, the term petitioners hereinafter refers collectively to: (1) John and Estate of Janet Heger, (2) George and Gail Heger, and (3) James and Molly Heger. Respondent issued separate notices of deficiency to petitioners on July 18, 1991. The notices reflected respondent's *423 determinations of deficiencies in and additions to petitioners' 1987 Federal income tax as follows: Additions to Tax
Sec.
Sec.
Sec. Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661 John and Estate
of Janet Heger
$ 13,456
$   673
[1]
$ 3,364
George and
Gail Heger
20,704
1,035
[1]
5,176
James and
Molly Heger
22,410
1,121
[1]
5,603
Following trial, the Court allowed respondent to amend her answer to conform it to the evidence. See Rule 41(b). Respondent asserted in her amended answer that petitioners' bases with respect to certain farm property located in Texas (Texas Farm Property) were less than the bases determined in her notices of deficiency and, accordingly, each pair of petitioners had additional unreported income of $ 31,756. Following concessions by the parties, [3] we must decide: *424 (1) Whether petitioners are allowed to increase their bases in the Texas Farm Property to reflect the $ 263,000 payment mentioned below. We conclude they are not. [4]
(2) Whether, under section 1244, petitioners are entitled to ordinary losses aggregating $ 145,483 in connection with the 1987 dissolution of Cinco H Oil & Gas, Inc. (Cinco). We conclude they are not; each pair of petitioners is entitled to a $ 200 ordinary loss under section 1244 and is entitled to a capital loss for their portion of the remaining $ 144,883. (3) Whether petitioners are liable for additions to tax for negligence under section 6653(a)(1)(A) and (B). We conclude they are. (4) Whether petitioners are liable for additions to tax for substantial understatement of tax under section 6661. We conclude they are. FINDINGS OF FACT 1. General
Petitioners resided in Texas at the times they filed their petitions. During the year in issue, John and Janet Heger, George and *425 Gail Heger, and James and Molly Heger were husbands and wives. John F. Heger (Father) is the father of John Heger, George Heger, James Heger, Jane Untermeyer, and Patricia Zatopek. Hereinafter, Father's five children are collectively referred to as Five Children, and Father's sons (John, George, and James) are collectively referred to as the Three Sons. Father and the Three Sons were longtime bankers; they owned banks and served as directors and officers. For the taxable year in issue, the Three Sons were senior executives of three banks, respectively, and each filed a 1987 Form 1040, U.S. Individual Income Tax Return, using the filing status of "Married filing joint return". 2. Texas Farm Property
The Texas Farm Property is 165.46 acres of farm land located in Fayette County, Texas. On December 26, 1975, immediately before the transfer mentioned below, Father owned a 25-percent undivided interest in the Texas Farm Property. On December 26, 1975, Father transferred by gift equal shares of this interest to: (1) John and Janet Heger, (2) James and Molly Heger, and (3) Jane Untermeyer and her husband, Joe Untermeyer (Untermeyers). Immediately before the gift, Father's *426 basis in the Texas Farm Property was $ 21,125. Father subsequently acquired the remaining 75 percent undivided interest in the Texas Farm Property. On June 7, 1977, Father transferred separate interests in the 75 percent interest to the Five Children and their spouses in consideration for $ 100,000. The interests transferred, as a percentage of the total property, were as follows: (1) seven-sixtieths to John and Janet Heger, (2) seven-sixtieths to James and Molly Heger, (3) seven-sixtieths to the Untermeyers, (4) one-fifth to George and Gail Heger, and (5) one-fifth to Patricia and Harvey Lee Zatopek (Zatopeks). [5] Following this transfer, each of the Five Children, with his or her spouse, owned an undivided 20 percent interest in the Texas Farm Property. On April 4, 1983, the Five Children and their spouses pledged the Texas *427 Farm Property to Victoria Bank and Trust (Victoria) to collateralize a debt of Wise Oil Co. (Wise). Wise was an oil and gas exploration partnership in which Father was a partner; Victoria was pressuring Wise for repayment of the debt because oil prices were declining. The Five Children and their spouses pledged the Texas Farm Property to increase the time over which Wise could repay its debt to Victoria; none of the pledgers had an interest in Wise. Wise subsequently defaulted on its debt to Victoria and Victoria threatened to foreclose on the Texas Farm Property. On February 25, 1985, prior to foreclosure, John Heger paid Victoria $ 250,000 and Victoria released its lien on the Texas Farm Property. On September 6, 1986, the Five Children and their spouses borrowed $ 263,000 from Allied Bank West Loop, N.A. (Allied), to repay John Heger the $ 250,000 he had paid to Victoria on February 25, 1985, and pay him $ 13,000 of interest on the funds. The Texas Farm Property collateralized the $ 263,000 loan from Allied. Neither the Five Children nor their spouses sought collection of the money paid to Victoria on behalf of Wise; they believed the partners of Wise were insolvent. On *428 April 27, 1987, the Untermeyers made four equal gifts of one-fourth of their 20 percent interest in the Texas Farm Property to the: (1) Zatopeks, and (2) Three Sons and their wives. On June 24, 1987, the Zatopeks, Three Sons, and Three Sons' wives sold the Texas Farm Property for $ 322,647, and repaid the $ 263,000 loan from Allied. The expenses of the sale were $ 1,850. On their 1987 Forms 1040, petitioners reported capital losses on the sale of the Texas Farm Property. [6] In computing their losses, each pair of petitioners included 25 percent of the $ 250,000 payment in their bases. [7] Respondent denied the losses, determining that the Five Children and their spouses had purchased the Texas Farm Property for $ 250,000 at a foreclosure sale and, accordingly, each pair of petitioners had a basis equal to 25 percent of the purchase price; this determination was reflected in her notices of deficiency. In her amended answer, respondent: (1) Conceded that Victoria never foreclosed on the Texas Farm Property, (2) asserted that the sale of the property resulted in a gain of $ 199,672 (i.e., selling price of $ 322,647 reduced by selling expenses of $ 1,850, less aggregate bases of $ *429 121,125), and (3) asserted that each pair of petitioners realized one-fourth of the gain on the sale. 3. Cinco
The Five Children incorporated Cinco under the laws of the State of Texas on January 24, 1985, with the intent that it would be profitable and self-supporting. [8] *430 The corporation was formed with $ 1,000 in capital; each of the Five Children contributed $ 200 in return for 200 shares of Cinco common stock with a par value of $ 1 per share. [9] At the time it was organized, Cinco adopted a resolution to issue stock pursuant to section 1244. Cinco's board of directors was the Five Children. In 1985, following its incorporation, Cinco borrowed $ 130,000 from Granger National Bank (Granger) to purchase oil and gas properties in its own name. George Heger held 52 percent of the stock of Granger and was its president. The loan was payable in less than 1 year, Cinco was the primary obligor, and the Five Children were guarantors of Cinco's obligation. The guarantors intended for Cinco to repay the loan. In both 1986 and 1987, Cinco borrowed $ 130,000, under terms similar to those in 1985, to repay the prior year's borrowing at or about the time of maturity. With respect to 1987, Cinco executed a note on May 14, 1987, evidencing its loan from Granger. The note indicated that: (1) Cinco was the sole borrower, (2) the loan amount was $ 130,000, (3) the interest rate was 9.15 percent, (4) accrued interest of $ 5,947.50 *431 was payable on November 13, 1987, and (5) principal ($ 130,000) and additional accrued interest ($ 5,947.50) were payable on May 13, 1988. The note was signed by John Heger in his capacity as president of Cinco and the Five Children (including John Heger) in their individual capacities. On November 26, 1987, the Five Children held a special meeting of the Cinco board of directors to discuss and act upon a plan for liquidation and dissolution of Cinco. The minutes of the meeting provided that the "meeting was called for the purpose of discussing the finalized sale of the oil and gas working interest and the fact that the sales price did not cover the bank loan collateralized by the property"; Cinco sold the oil and gas working interest, its only asset with the exception of minimal cash, on April 20, 1987, for $ 17,500 (i.e., at a loss of $ 135,687). The Five Children adopted a resolution ratifying and approving the sale of the working interest. The Five Children also adopted a resolution under which the Three Sons would "purchase from the corporation additional shares of Forty-four thousand two hundred twenty seven [44,227] each at a $ 1 per share" and the funds would be used *432 to pay the $ 130,000 loan from Granger. On December 24, 1987, the Three Sons accepted Cinco's offer to sell to them 44,227 shares of Cinco common stock at $ 1 per share; Granger loaned each of the Three Sons $ 44,227.89 and the Three Sons "bought stock in the corporation". Contemporaneously therewith, Cinco repaid the loan from Granger with the proceeds. On December 25, 1987, the Five Children held another special meeting to discuss and act upon a plan for liquidation and dissolution of Cinco. The Five Children unanimously adopted a formal plan of liquidation for Cinco. Cinco was dissolved on December 30, 1987. Cinco's liabilities exceeded its assets at the time of its dissolution and Cinco distributed no property to the Five Children in connection with the dissolution. At the end of its 1985 and 1986 taxable years, Cinco's only liabilities consisted of: (1) $ 130,000 owed to Granger and (2) $ 30,600 and $ 48,061, respectively, owed to its shareholders. [10] At the time of its dissolution, Cinco owed $ 31,100 to James Heger and $ 16,956 to John Heger. These amounts were never paid. On its 1985, 1986, and 1987 Forms 1120, U.S. Corporation Income Tax Return, Cinco reported that *433 it paid interest of $ 8,654, $ 16,070, and $ 7,119, respectively. [11]
On their respective 1987 Forms 1040, the Three Sons reported Cinco's dissolution as follows: (1) John and Janet Heger claimed an ordinary loss under section 1244 in the amount of $ 46,428, [12] (2) George and Gail Heger claimed an ordinary loss under section 1244 in the amount of $ 44,227, [13] and (3) James and Molly Heger claimed an ordinary loss under section 1244 in the amount of $ 54,828. [14] Respondent fully disallowed these ordinary losses, determining that petitioners did not sustain a loss under section 1244. Respondent conceded in her answer to the amended *434 petition that petitioners were allowed to deduct capital losses upon Cinco's dissolution as follows: John and Janet Heger -- $ 45,227.89; George and Gail Heger -- $ 44,227.00; and James and Molly Heger -- $ 54,828.00. For the 1987 taxable year, a certified public accountant prepared John and *435 Janet Heger's Form 1040, a self-employed tax preparer prepared George and Gail Heger's Form 1040, and James and Molly Heger prepared their Form 1040. OPINION The burden of proof is on petitioners to show that respondent's determinations set forth in her notices of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Respondent bears the burden of proving the increase in deficiency asserted in her amended answer. Rule 142(a); Estate of Bowers v. Commissioner, 94 T.C. 582, 595 (1990). We turn to the issues for decision. 1. Texas Farm Property
Petitioners and the Zatopeks sold the Texas Farm Property for $ 322,647 and the expenses of the sale were $ 1,850. At the time of the sale, each couple owned a 25-percent undivided interest in the property. Accordingly, petitioners each realized $ 80,199.25 on the sale of the Texas Farm Property. Sec. 1001(b). In order to determine petitioners' gain or loss on the sale, we must determine their bases in the property. Sec. 1001(a). The parties agreed that the aggregate bases that petitioners and the Zatopeks had in the Texas Farm Property *436 were at least $ 121,125. See secs. 1012, 1015(a). The parties disagreed, however, on whether these minimum bases were increased as a result of the $ 250,000 payment to Victoria in 1985 and the $ 13,000 payment to John Heger in 1986. Respondent argued that petitioners' bases were not increased by the payments. Petitioners argued that the $ 250,000 and $ 13,000 payments protected or defended their title in the Texas Farm Property and consequently, were capital expenditures which must be added to petitioners' bases. We disagree with petitioners and conclude that the aggregate bases that petitioners and the Zatopeks had in the Texas Farm Property were $ 121,125. Neither petitioners' $ 250,000 payment to Victoria nor their $ 13,000 payment to John Heger was made to protect or defend their title in the Texas Farm Property; simply stated, neither Victoria nor John Heger contested petitioners' title to the property. Petitioners entered into a security agreement with Victoria under which the Texas Farm Property collateralized Wise's debt to Victoria. When Wise defaulted on its debt, Victoria proceeded to foreclose on the property. As an alternative to losing the Texas Farm Property *437 by foreclosure, petitioners opted to pay Wise's debt. In making the payment to Victoria, petitioners were subrogated to the rights of Victoria to seek collection from Wise and its general partners. Dietrich Industries, Inc. v. United States, 988 F.2d 568, 571 (5th Cir. 1993); Fears v. Albea, 69 Tex. 437, 440, 6 S.W. 286, 289 (1887). Petitioners made no attempt to seek reimbursement from Wise or its general partners. [15]
*438 The cases and revenue ruling cited by petitioners to support their anomalous proposition that these payments increased their bases in the Texas Farm Property are easily distinguishable on their facts and do not merit further discussion. We also considered the arguments made by petitioners on brief and found them unpersuasive. Accordingly, we sustain respondent's determination that the bases of petitioners and the Zatopeks in the Texas Farm Property may not be increased as a result of the $ 250,000 payment to Victoria in 1985 and the $ 13,000 payment to John Heger in 1986. The respective bases of petitioners are determined using a transferred basis for the interests received by gifts from Father and the Untermeyers, secs. 1015(a), 7701(a)(43), and a cost basis for the interests purchased from Father, sec. 1012. Petitioners' gains on the sale of the Texas Farm Property are as follows: Selling
Price
Basis
Gain John and Janet Heger
$ 80,199.25
$ 28,246.54
$ 51,952.71
George and Gail Heger
80,199.25
32,315.98
47,883.27
James and Molly Heger
80,199.25
28,246.54
51,952.71
Petitioners' gains are reportable as capital gains. Sec. 1221. [16]
*439 2. Cinco
Section 165(g)(1) and (2)(A) generally provides that a taxpayer realizes a capital loss when stock that is a capital asset becomes worthless. Section 1244 allows an individual to treat as an ordinary loss a loss on "section 1244 stock" that would otherwise be a capital loss. Sec. 1244(a). This treatment is limited annually to $ 100,000 in the case of a joint return. Sec. 1244(b). The term "section 1244 stock" generally means stock of a qualifying domestic corporation that was issued for money or other property (other than stock or securities). Sec. 1244(c). However, stock within the literal definition of section 1244 stock does not qualify for ordinary loss treatment if it was issued by a corporation that was in the process of dissolution. Bruce v. United States, 409 F.2d 1317, 1318 (5th Cir. 1969); Hill v. Commissioner, 51 T.C. 621, 628-630 (1969); Morgan v. Commissioner, 46 T.C. 878, 892-893 (1966); see also Gregory v. Helvering, 293 U.S. 465 (1935). It is undisputed by the parties that Cinco was a qualifying domestic corporation *440 under section 1244 and that the Three Sons sustained a loss upon the dissolution of Cinco. The primary question is whether the stock issued to the Three Sons in 1987 qualified as section 1244 stock. Respondent argued that it did not because it was issued by Cinco in contemplation of liquidation. Petitioners argued that, although the stock was formally issued to the Three Sons in 1987, the stock was actually issued to them in 1985 in consideration for Cinco's receipt of the $ 130,000 from Granger. In other words, petitioners argued, Granger did not loan the $ 130,000 to Cinco in 1985, 1986, and 1987; Granger loaned the money to the Three Sons who, in turn, contributed the money to the equity of Cinco. The facts of the case do not support petitioners' argument that Granger made the $ 130,000 loans to the Three Sons rather than Cinco. Among other things: (1) The note evidencing the 1987 loan was executed in Cinco's name, (2) Cinco's Federal income tax returns reflected the loans as obligations of Cinco, (3) Cinco's Federal income tax returns never reflected outstanding stock of more than $ 1,000 in value, (4) Cinco paid interest for the years at issue aggregating approximately $ *441 32,000; the facts strongly suggest that this interest was attributable primarily (if not entirely) to the loans from Granger, and (5) it does not appear that petitioners paid Granger any interest on the loans. The purposes of the two special board meetings, the timing of the 1987 issuance of the stock to the Three Sons vis-a-vis Cinco's dissolution, Cinco's sale of its only asset on April 20, 1987, and Cinco's negative net worth upon dissolution also indicate that the Three Sons' 1987 stock purchase was a prearranged plan to receive an ordinary loss deduction for satisfying Cinco's creditor, Granger, after Cinco had ceased operations. Petitioners asserted on brief that the loans from Granger to Cinco were really loans to the Three Sons because the Three Sons guaranteed the loans of a newly formed, thinly capitalized corporation. Apart from the lack of factual support for such assertion, petitioners overlooked the fact that the Five Children, and not just the Three Sons, guaranteed the loans. In addition, we fathom that a cautious lender to a newly formed, closely held corporation, such as Cinco, would require personal guarantees from all the shareholders. Harris v. United States, 902 F.2d 439, 445 (5th Cir. 1990). *442 However, the fact that petitioners guaranteed the loan does not convert the loan to Cinco into a loan to petitioners. We conclude that Cinco issued the 44,227 shares of stock to the Three Sons in 1987. Shortly thereafter, Cinco liquidated and dissolved; Cinco's dissolution was imminent when the shares were issued. Both this Court and the Court of Appeals for the Fifth Circuit, the circuit to which this case is appealable, have held that stock issued in anticipation of liquidation does not qualify for ordinary loss treatment under section 1244. Bruce v. United States, supra at 1318; Hill v. Commissioner, supra at 628-630; Morgan v. Commissioner, supra at 892-893. We hold likewise today; we considered the cases cited and arguments made by petitioners on brief and found them unpersuasive. Accordingly, each pair of petitioners is allowed an ordinary loss deduction of $ 200. Taking into account respondent's concessions on this issue, capital losses are also allowed as follows: John and Janet Heger -- $ 45,027.89; George and Gail Heger -- $ 44,027; and James and Molly Heger -- *443 $ 54,628. 3. Additions to Tax for Negligence and Substantial Understatements
Respondent determined that petitioners' underpayments of income taxes in 1987 were due to negligence or intentional disregard of rules or regulations. Accordingly, respondent determined petitioners were liable for additions to tax for negligence under section 6653(a)(1)(A) and (B). Section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence. Section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. Negligence includes a lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. McGee v. Commissioner, 979 F.2d 66, 71 (5th Cir. 1992), affg. T.C. Memo. 1991-510; Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985). *444 Petitioners bear the burden of proving that respondent's determination of negligence is erroneous. Rule 142(a); Barton v. Commissioner, 424 F.2d 1295, 1296 (7th Cir. 1970), affg. T.C. Memo. 1969-46; Marcello v. Commissioner, supra at 506-507; Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Respondent also determined that petitioners are liable for additions to tax for substantial understatements under section 6661. The amount of the section 6661 addition to tax for additions assessed after October 21, 1986, equals 25 percent of the amount attributable to the substantial understatement. Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951; Pallottini v. Commissioner, 90 T.C. 498, 500-503 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). An understatement is reduced to the extent it is: (1) Based on substantial authority, or (2) adequately disclosed in the return or in a statement *445 attached to the return. Sec. 6661(b)(2). Respondent's determination of an addition to tax for substantial understatements under section 6661 is presumed to be correct and petitioners bear the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Sandvall v. Commissioner, 898 F.2d 455, 459 (5th Cir. 1990), affg. T.C. Memo. 1989-189 and T.C. Memo. 1989-56. Petitioners cited no relevant authority to support the amounts they reported and that were adjusted by respondent. Based on the facts of the case, including the Three Sons' positions as senior executives of financial institutions, we sustain respondent's determinations of additions to tax for negligence under section 6653(a)(1)(A) and (B) and substantial understatements under section 6661. Petitioners have failed to prove they are not liable for these additions to tax. In this regard, we have considered petitioners' arguments concerning these additions to tax and found them unpersuasive. For the foregoing reasons, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: George E. Heger and Gail Y. Heger, docket No. 22671-91; and James C. Heger and Molly A. Heger, docket No. 22672-91.↩
2. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for 1987, the year in issue.↩
1. This amount is 50 percent of the interest on the deficiency.↩
3. Respondent conceded in her answers to the amended petitions that petitioners are each entitled to a capital loss carryover from bad debts incurred during the 1985 taxable year. The parties stipulated that: (1) John and Janet Heger did not report interest income of $ 520 and were not entitled to deduct $ 1,910 of the miscellaneous deductions reported on their 1987 return, and (2) James and Molly Heger were not entitled to deduct $ 4,514 of the advertising expenses and $ 2,690 of car and truck expenses reported on their 1987 return. Respondent conceded on brief that: (1) John and Janet Heger sustained a short-term capital loss of $ 16,956.18 on their loans to Cinco H Oil & Gas, Inc. (Cinco), and (2) James and Molly Heger sustained a short-term capital loss of $ 31,100 on their loans to Cinco.↩
4. Petitioners alleged that they had a loss on the sale of certain farm property located in Texas (Texas Farm Property) and were entitled to an ordinary loss under sec. 1231; the property generated minimal revenue. We need not address this issue because we conclude they had a gain on the sale of the property.↩
5. Although the record is not entirely clear, we assume that each of the Five Children and his or her spouse paid fair market value for the percentage of the property that he or she received.↩
6. James and Molly Heger also reported an unrelated capital loss of $ 1,520 and capital gains totaling $ 4,942; respondent disallowed the $ 1,520 capital loss. George and Gail Heger also reported a capital gain of $ 176.78.↩
7. Presumably, petitioners allocated the remaining 25 percent to Patricia and Harvey Lee Zatopek.↩
8. Cinco never reported a profit during 3 years of existence. Cinco derived its income from royalties from the sale of oil and gas leases that it owned and operated.↩
9. According to Cinco's 1985, 1986, and 1987 Forms 1120, U.S. Corporation Income Tax Return, Cinco had $ 1,000 of common stock outstanding at the: (1) End of the 1985 taxable year, (2) beginning and end of the 1986 taxable year, and (3) beginning of the 1987 taxable year.↩
10. The record does not indicate the interest rates on the 1985 and 1986 loans from Granger National Bank (Granger). Petitioners did not receive any interest income from Cinco in 1987.↩
11. The record does not indicate what portion (if any) of the interest deductions were attributable to the loans from Granger. Petitioners did not claim to have paid any interest on these loans.↩
12. Of this amount $ 44,427 consisted of John Heger's payments for the 200 and 44,227 shares of Cinco stock issued to him in 1985 and 1987, respectively. John Heger could not explain the additional $ 2,001 of ordinary loss reported on his 1987 return.↩
13. George Heger paid for the 200 and 44,227 shares of Cinco stock issued to him in 1985 and 1987, respectively. The record does not indicate why he reported only a $ 44,227 loss on the dissolution of Cinco.↩
14. This amount consisted of James Heger's payments for: (1) The 200 shares of Cinco stock issued to him in 1985, (2) the 44,227 shares of Cinco stock issued to him in 1987, and (3) debts of Cinco totaling $ 10,401, for which he did not receive stock certificates.↩
15. Respondent stated on brief that petitioners could have taken a nonbusiness bad debt deduction in 1985 for the $ 250,000 payment. See sec. 166(d). As the 1985 taxable year is not properly before the Court, we express no opinion on respondent's statement. We also express no opinion on whether petitioners were allowed a nonbusiness bad debt deduction in the year at issue because neither party has raised or discussed this issue. Frentz v. Commissioner, 44 T.C. 485, 491 (1965) ("The Court has held on numerous occasions that it will not consider issues which have not been pleaded"), affd. 375 F.2d 662↩ (6th Cir. 1967).
16. With respect to the $ 1,520 capital loss deduction disallowed by respondent, supra note 6, James and Molly Heger adduced no evidence at trial supporting their entitlement to this deduction. Accordingly, we sustain respondent's disallowance. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115↩ (1933).